IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION<br><br>This Document Relates To:<br>*Invesco Sub-Track*,<br>04-md-15864-02 | )<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 1586<br><br>Case No. 04-MD-15864-02<br>(Hon. J. Frederick Motz) |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENTS**
**AND PLAN OF ALLOCATION IN THE INVESCO SUB-TRACK**

Dated: September 14, 2010

**TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 2

A. The Settlements ........ 2

B. Reason for the Settlements ........ 3

II. THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED ........ 5

A. The Standards for Judicial Approval of Class Action and Derivative Action Settlements ........ 5

B. Application of the Fairness Factors Supports Final Approval of the Settlements ........ 7

1. The Posture of the Case and Extent of Discovery ........ 7

2. The Circumstances Surrounding the Negotiations ........ 10

3. The Experience of Counsel in Securities Class Action & Derivative Litigation ........ 11

C. Application of the Adequacy Factors Supports Final Approval of the Settlements ........ 13

1. The Strength of Plaintiffs' Cases and the Potential Difficulties of Proof or Strong Defenses ........ 13

2. The Anticipated Duration and Expense of Additional Litigation ........ 18

3. The Solvency of Defendants and the Likelihood of Recovery on a Litigated Judgment ........ 19

4. Investor Reaction to the Proposed Settlements ........ 20

III. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED ........ 26

IV. THE PROPOSED CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES UNDER RULE 23 ........ 28

V. THE NOTICE TO CLASS MEMBERS AND CURRENT SHAREHOLDERS SATISFIED THE REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE, THE PSLRA, AND DUE PROCESS. .......... 29

VI. CONCLUSION .......... 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re AremisSoft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002)....................13

*In re AT&T Corp. Sec. Litig.*,
455 F.3d 160 (3d Cir. 2006)....................23

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)....................22

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007)....................12, 26

*Flinn v. FMC Corp.*,
528 F.2d 1169 (4th Cir. 1974) ....................6, 12, 18, 20

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ....................12, 17

*Granada Invs., Inc. v. DOG Corp.*,
962 F.2d 1203 (6th Cir. 1992) ....................14

*Henley v. FMC Corp.*,
207 F. Supp. 2d 489 (S.D.W. Va. 2002)....................20

*Int'l Union v. Ford Motor Co.*,
Nos. 05-74730, 2006 WL 1984363 (E.D. Mich. July 13, 2006) ....................23

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) .................... *passim*

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
No. 1:08cv1310 (AJT/JFA), 2009 WL 3094955 (E.D. Va. Sept. 28, 2009) ....................5, 6

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) ....................14

*In re Marsh & McLennan Cos. Sec. Litig.*,
No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)....................17, 25

*In re MicroStrategy, Inc. Sec. Litig.*,
148 F. Supp. 2d 654 (E.D. Va. 2001) .................... *passim*

*In re Mid-Atl. Toyota Antitrust Litig.*,
605 F. Supp. 440 (D. Md. 1984)....5

*Muhammad v. Nat'l City Mortg., Inc.*,
No. 2:07-0423, 2008 WL 5377783 (S.D.W. Va. Dec. 19, 2008) ....7, 10

*In re Mut. Funds Inv. Litig.*,
590 F. Supp. 2d 741 (D. Md. 2008)....16, 17

*In re Mut. Funds Inv. Litig.*,
608 F. Supp. 2d 677 (D. Md. 2009)....16

*In re Mut. Funds Inv. Litig.*,
626 F. Supp. 2d 530 (D. Md. 2009)....16

*In re OCA, Inc. Sec. & Derivative Litig.*,
No. 05-2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009) ....7, 8, 23

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997)....26

*In re PNC Fin. Servs. Grp., Inc. Sec. Litig.*,
440 F. Supp. 2d 421 (W.D. Pa. 2006)....10

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
390 U.S. 414 (1968)....18

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)....22

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ....28

*S.C. Nat'l Bank v. Stone*,
139 F.R.D. 335 (D.S.C. 1991) .... *passim*

*In re Serzone Prods. Liab. Litig.*,
231 F.R.D. 221 (S.D. W. Va. 2005)....5, 19, 20

*Strang v. JHM Mortg. Sec. Ltd. P'ship*,
890 F. Supp. 499 (E.D. Va. 1995) ....7, 10

*In re The Mills Corp. Sec. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) .... *passim*

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)....20

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)....26

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 CIV 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004)....25

*Zimmerman v. Bell*,
800 F.2d 386 (4th Cir. 1986)....5, 13

**STATUTES & RULES**

15 U.S.C. § 78u-4(a)(7)....21

Fed. R. Civ. P. 23....18, 28

Fed. R. Civ. P. 23(b)(3)....17

Fed. R. Civ. P. 23(c)(2)....29

Fed. R. Civ. P. 23(e)....5, 29

Fed. R. Civ. P. 23(e)(2)....5

Fed. R. Civ. P. 23.1....5, 30

**OTHER AUTHORITIES**

4 NEWBERG ON CLASS ACTIONS § 11.51....10

Court-appointed Lead Plaintiff in the Investor Class Action, the City of Chicago Deferred Compensation Plan ("Investor Class Lead Plaintiff"), on behalf of itself and all members of the Investor Class; plaintiff Miriam Calderon in the ERISA Action ("ERISA Class Lead Plaintiff"), on behalf of herself and all members of the ERISA Class; and plaintiffs Silvana G. Della Camera, Edward Casey, Tina Casey, L. Scott Karlin, Gerson Smith, Cynthia Puleo, Zachary Alan Starr, and Amy Sugin, acting on behalf of the Invesco/AIM Funds in the Derivative Action (collectively, the "Derivative Plaintiffs," and together with the Investor Class Lead Plaintiff and ERISA Lead Plaintiff, the "Plaintiffs"), respectfully submit this Memorandum of Law in support of their motion for final approval of their respective proposed settlements of class and derivative claims pending in the Invesco sub-track of MDL-1586 - *In re Mutual Funds Investment Litigation* (the "MDL") (the "Settlements") and final approval of the proposed plan of allocation of the settlement proceeds in the Invesco sub-track (the "Plan of Allocation").[1] Specifically, Plaintiffs seek entry of proposed Orders and Final Judgments that will, *inter alia*, finally approve the Settlements and certify the Investor and ERISA Classes (defined in Section IV, below) for settlement purposes. Plaintiffs also seek entry of a proposed order approving the Plan of Allocation.[2]

---

[1] Investor Class Lead Plaintiff is simultaneously submitting herewith the Declaration of Chad Johnson, William C. Fredericks and Jerald Bien-Willner in Support of Motion for Final Approval of the Proposed Settlements, Plan of Allocation of Settlement Proceeds, and Application for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses in the Invesco Sub-Track (the "BLB&G Declaration" or "BLB&G Decl."). The BLB&G Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Investor Class Action in this sub-track; the nature of the claims asserted in this litigation; the negotiations leading to the Settlements; the value of the Settlements to the Investor Class, as compared to the risks and uncertainties of continued litigation; the extensive notice program conducted in this sub-track; and the terms of the Plan of Allocation for the settlement proceeds. Derivative Plaintiffs are also submitting the Declaration of Mark C. Rifkin in Support of Motion for Final Approval of the Proposed Settlements, and Application for an Award of Attorneys' Fees and Reimbursement ("Rifkin Decl."), which addresses matters specific to the Derivative Action, and is also an integral part of this submission.

[2] The proposed Orders and Final Judgments and the proposed Order Approving the Plan of Allocation in

# I. INTRODUCTION

## A. The Settlements

The proposed Settlements now before the Court for final approval in the Invesco sub-track provide for the total payment of $20,455,400 in cash, plus interest earned thereon (the "Settlement Fund"). The Settlement Fund is comprised of: (i) $9,750,000 paid on behalf of the Invesco/AIM Advisor Defendants for the benefit of the Investor Class, the ERISA Class and the Invesco/AIM Funds; (ii) $5,745,000 paid on behalf of the Canary Defendants for the benefit of the Investor Class and the Funds; (iii) $3,882,400 paid on behalf of BAS for the benefit of the Investor Class and the Funds; and (iv) $1,078,000 paid on behalf of the Bear Stearns Defendants for the benefit of the Investor Class.[3] Pursuant to the Stipulations, these settlement funds have been paid into interest-bearing escrow accounts pending final approval of the Settlements and distribution to the Investor Class pursuant to the Plan of Allocation. In addition to these amounts, Investor Class Lead Counsel intends to distribute $11,490,000 plus interest (which was obtained by the Office of the New York Attorney General in its settlement with the Canary Defendants) to the Investor Class. The Settlements also provide that certain of the Invesco/AIM Advisor Defendants will establish, and maintain for at least five years, a group to develop and implement policies to monitor and prevent market-timing and late trading in the Invesco/AIM Funds. These structural reforms will benefit the Invesco/AIM Funds and their current and future investors.

---

the Invesco sub-track will be submitted to the Court with Plaintiffs' filing on October 6, 2010.

[3] The stipulations and agreements setting forth the full terms of the Settlements are included in the Invesco Appendix submitted in connection with Plaintiffs' Motion for Preliminary Approval (Dkt. No. 1011) as Exhibits 2 to 13 (Dkt. Nos. 1011-8 – 1011-15). Investor Class Lead Plaintiff, on behalf of the Investor Class, is a party to all of the Settlements; ERISA Lead Plaintiff, on behalf of the ERISA Class, is a party to the proposed settlement with the Invesco/AIM Advisor Defendants; and the Derivative Plaintiffs, on behalf of the Invesco/AIM Funds, are parties to the proposed settlements with the Invesco/AIM Advisor Defendants, the Invesco/AIM Funds Defendants, BAS and the Canary Defendants.

The Settlements are the result of hard fought, arm's-length negotiations between the relevant Lead Counsel for the Plaintiffs, who were well informed in the strengths and weaknesses of their claims, and the relevant experienced counsel for the Settling Defendants. It is the informed opinion of Plaintiffs and their Lead Counsel that, given the uncertainty and further substantial expense of pursuing the Actions in this sub-track through trial and possible appeals, that their proposed, respective Settlements are fair, reasonable, and adequate. Indeed, if the Actions were to continue, Plaintiffs would face significant risks in obtaining any recovery from the defendants. For example, Plaintiffs would have faced significant obstacles in establishing the liability of the Settling Defendants and proving damages above the significant amounts that certain Settling Defendants had already paid in restitution to government regulators.

As discussed in detail below, Investor Class Lead Plaintiff and its counsel submit that all of the Settlements are fair, reasonable, and adequate and in the best interests of the Investor Class; ERISA Lead Counsel submit that the Settlements in which they are participating are fair, reasonable, and adequate and in the best interests of the ERISA Class; and Derivative Counsel submit that the Settlements in which they are participating are fair, reasonable, and adequate and in the best interests of the Invesco/AIM Funds. Accordingly, Plaintiffs respectfully move for final approval of their respective proposed Settlements.

### B. Reason for the Settlements

The proposed Settlements are the end result of the vigorous prosecution of these complex litigations by Plaintiffs and their Lead Counsel for over six years including, for example, detailed investigation of their claims, briefing on dispositive motions to dismiss and on a number of other matters, comprehensive analysis of potential damages by an expert retained by Investor Class Lead Plaintiff, formal and informal discovery, and extensive settlement negotiations with

multiple sets of defendants. By the time the Plaintiffs reached their respective agreements in principle to settle with each of the Settling Defendants, Plaintiffs possessed a thorough understanding of the strengths and weaknesses of their claims, the damages suffered by the Classes and the Funds, and the potential strength of the defenses put forward by the Settling Defendants. *See, e.g.*, BLB&G Decl.

In reaching the Settlements, Lead Counsel considered the complexity of the litigation and the substantial additional expense and time that would be necessary to prosecute the Actions through the completion of discovery, class certification, summary judgment, trial, and the inevitable appeals. These Actions raise novel and unsettled questions of law and involve numerous complex legal and factual issues, as well as the procedural complexities created by the existence of several sets of plaintiffs litigating against multiple sets of defendants represented by separate counsel. *See id*. Plaintiffs also faced the reality that, to the extent that members of the Classes and/or the Funds had suffered compensable damages, Defendants could put forth a strong argument that the payments made by certain of the defendants to the SEC and other government regulators and subsequently distributed to certain Invesco/AIM Funds investors (and certain of the Invesco/AIM Funds themselves) should offset any damages recovered at trial. *See, e.g.*, BLB&G Decl. ¶¶ 38-41. In light of all the circumstances, after a careful analysis of the relative strengths and weaknesses of the claims and defenses asserted, the risks of continued litigation and the time and expense that would be necessary to prosecute these complex Actions through to verdicts and possible appeals, Plaintiffs and their Lead Counsel believe that their respective proposed Settlements – which will result in the global settlement of all Investor Class, ERISA Class and Derivative claims asserted in the Invesco sub-track – are fair, adequate and reasonable. Accordingly, Plaintiffs respectfully submit that the Settlements should be approved

by this Court.

## II. THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

### A. The Standards for Judicial Approval of Class Action and Derivative Action Settlements

There is a strong judicial policy in this Circuit favoring the resolution of litigation through settlement, particularly in class actions and other complex litigation. *See Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08cv1310 (AJT/JFA), 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009); *see generally* Plaintiffs' Omnibus Memorandum of Law In Support of Final Approval of Proposed Settlements and Plans of Allocation ("Omnibus Final Approval Memo"), § I.A.[4]

Federal Rules of Civil Procedure 23(e) and 23.1 respectively govern settlements of class and derivative actions, such as the instant Actions, and require a judicial determination that settlements of any such claims are "fair, reasonable, and adequate" and were entered into without collusion of the parties. *See* Fed. R. Civ. P. 23(e)(2) and 23.1; *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 223 (S.D. W. Va. 2005); *In re Mid-Atl. Toyota Antitrust Litig.*, 605 F. Supp. 440, 442 (D. Md. 1984); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986) (approval of derivative actions); *see also* Omnibus Final Approval Memo §§ I.A, II. In evaluating the reasonableness of the result reached, the Court must recognize that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution," *In re The Mills Corp. Sec. Litig.*, 265

[4] In addition to the points and authorities in this Memorandum in support of final approval of Plaintiffs' respective Settlements in the Invesco sub-track, Plaintiffs respectfully refer the Court to the Omnibus Final Approval Memo, which is being filed concurrently with this Memorandum and is frequently referred to herein, for additional points and authorities concerning the legal standards applicable to Plaintiffs' motion for final approval of the Settlements and Plan of Allocation.

F.R.D. 246, 258 (E.D. Va. 2009). Accordingly, the trial court "should not make a proponent of a proposed settlement justify each term of a settlement agreement against a hypothetical or speculative measure of what concessions might have been gained." *Lomascolo*, 2009 WL 3094955, at *10; *accord Mills*, 265 F.R.D. at 257. In determining whether a given settlement meets this standard, the court "should not . . . turn the settlement hearing into a trial or rehearsal of the trial nor need it reach any dispositive conclusions on the admittedly unsettled legal issues in the case." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1974) (citations and internal quotation marks omitted).

The Fourth Circuit has identified a set of factors that a district court should consider in determining whether a proposed settlement is "fair, reasonable, and adequate," which are grouped into two principal components: (1) considerations of *fairness*, which focus on whether the proposed settlement is the result of good-faith, arms'-length negotiations, and (2) considerations of *adequacy*, which focus on substantive terms of the settlement and, in particular, whether the settlement consideration provided to class members is sufficient in light of the risks and costs of continued litigation. *See Jiffy Lube*, 927 F.2d at 158-59; *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001).

As discussed in detail below, consideration of these factors demonstrates that the Settlements are fair, reasonable, and adequate and should be approved. The Settlements are each the result of extensive arms'-length negotiations by informed counsel and offer substantial benefits for their respective intended beneficiaries, including the creation of a Settlement Fund of more than $20 million in cash. Given the complexity of this litigation and the significant risks that would be faced if the parties were to proceed with continued litigation and a possible trial and appeals, Plaintiffs believe that the Settlements they have entered into, respectively, represent

excellent recoveries for the Classes and Funds that they represent. The Settlements eliminate the substantial risks that Plaintiffs, after years of additional litigation, might not recover anything from the Settling Defendants or might recover an amount less than the settlement funds obtained.

**B. Application of the Fairness Factors <u>Supports Final Approval of the Settlements</u>**

Courts in the Fourth Circuit analyze four factors when assessing the fairness of a proposed settlement: (i) the posture of the case at the time settlement was proposed, (ii) the extent of discovery that had been conducted, (iii) the circumstances surrounding the negotiations, and (iv) the experience of counsel. *See Jiffy Lube*, 927 F.2d at 158-59; *see generally* Omnibus Final Approval Memo § I.B These factors strongly support approval of the proposed Settlements.

**1. The Posture of the Case and Extent of Discovery**

The first two *Jiffy Lube* factors direct the Court to consider the stage of the litigation at the time settlement was reached and extent of discovery that has been conducted in the case. *See, e.g.*, *Mills*, 265 F.R.D. at 254; *Muhammad v. Nat'l City Mortg., Inc.*, No. 2:07-0423, 2008 WL 5377783, at *3 (S.D.W. Va. Dec. 19, 2008); *MicroStrategy*, 148 F. Supp. 2d at 664; Omnibus Final Approval Memo § I.B.1. No specific amount of formal discovery is necessary – the key inquiry for the Court is whether the parties and their counsel have "sufficiently developed the case such that they can appreciate the merits of the claims." *Muhammad*, 2008 WL 5377783, at *3; *accord Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995) ("Plaintiffs have conducted sufficient informal discovery and investigation to fairly evaluate the merits of Defendants' positions during settlement negotiations"); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009) ("The question is not whether the parties have completed a particular amount of discovery, but whether

the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.”).

In the Invesco sub-track, Plaintiffs and Plaintiffs’ Counsel participated in protracted, arms’-length settlement negotiations with separate groups of defendants, represented by separate, highly experienced counsel, over the course of several years to reach their respective Settlements, and even the earliest proposed agreements in principle to settle only occurred after Plaintiffs’ Counsel, on behalf of their respective clients, had engaged in a significant investigation of the facts and claims in the Actions. *See, e.g.,* BLB&G Decl. The news of alleged market timing and late trading in various mutual fund families first broke in 2003. Several lawsuits were filed starting in late 2003, the instant MDL was formed and organized in the early part of 2004, and Plaintiffs and their counsel began investigating their respective claims during that time frame. *Id.* ¶¶ 7-12. Only after all of those events had occurred, the first proposed settlement – the agreement in principle to settle with the Canary Defendants – was reached in July 2004, and it reflects the only one of the Settlements reached prior to defendants filing their vigorously contested motions to dismiss in 2005. As a result of the proposed Canary Defendant settlement, Plaintiffs obtained a significant global monetary recovery, as well as substantial non-public factual information concerning their claims, which included multiple interview sessions with a percipient witness and a wealth of non-public documents, all of which helped them to advance their cases against the other defendants and to file robust consolidated amended complaints in late September 2004. *Id*. ¶ 13.

As the Court is aware, the other defendants filed numerous motions to dismiss and other legal challenges to Plaintiffs’ claims. All proposed settlements (except, as noted above, the

proposed Canary settlement) were reached after defendants' voluminous motions to dismiss were filed. *See, e.g.*, BLB&G Decl. ¶¶ 17-19. Each of the proposed settlements was reached only after Plaintiffs, through the efforts of their respective counsel, had developed a thorough understanding of the strengths and weakness of their respective cases. *See, e.g.*, BLB&G Decl. ¶¶ 12-42; Rifkin Decl. ¶¶ 7, 13. For example, Investor Class Lead Plaintiff, through its counsel, engaged in extensive formal and informal discovery with the Invesco/AIM Advisor Defendants, who produced trading data to Investor Class Lead Plaintiff that was essential for its damages analyses, as well as a large quantity of documents the Invesco/AIM Advisor Defendants had previously produced to the SEC. BLB&G Decl. ¶¶ 23-25, 30-32 . In addition to obtaining extensive written discovery, Investor Class Lead Counsel and Derivative Lead Counsel deposed numerous key fact witnesses related to Invesco, including Invesco's former Chief Investment Officer and former Chief Executive Officer. *Id*. Derivative Lead Counsel, in addition to participating in those depositions, also deposed trustees of the Invesco/AIM Funds, and was solely responsible for discovery relating to the AIM Funds. Rifkin Decl. ¶ 14. Similarly, the Bear Stearns Defendants did not agree to settle until well after a program of discovery had been initiated by BLB&G. *See* BLB&G Decl. ¶¶ 33-34. In addition, the progress of cases in certain other sub-tracks, including briefs filed and decisions rendered by the Court, provided Plaintiffs in the Invesco sub-track with an unusually detailed understanding of certain legal issues that would also be confronted in their Actions.

Therefore, Plaintiffs had a thorough understanding of the strengths and weaknesses of their claims, as well as the likelihood of obtaining a greater recovery, with respect to each of their respective proposed Settlements, before agreeing in principle to settle. Thus, these factors weigh in favor of approval of the Settlements. *See, e.g., MicroStrategy*, 148 F. Supp. 2d at 664

(approving proposed settlement despite the fact that it was reached "relatively early" in the litigation because the settlement came after the parties vigorously contested defendant's motion to dismiss); *In re PNC Fin. Servs. Grp., Inc. Sec. Litig.*, 440 F. Supp. 2d 421, 433 (W.D. Pa. 2006) (approving settlement where counsel had "gained a thorough understanding of the legal and factual issues" despite the lack of formal discovery); *Strang*, 890 F. Supp. at 501 (same).

**2. The Circumstances Surrounding the Negotiations**

In evaluating the fairness of the proposed settlements, courts consider the circumstances surrounding the settlement negotiations. *See generally* Omnibus Final Approval Memo at § I.B.2; *see also, e.g., Mills*, 265 F.R.D. at 255; *MicroStrategy*, 148 F. Supp. 2d at 665. In the absence of any evidence to the contrary, the court "may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Muhammad*, 2008 WL 5377783, at *4; *see* 4 NEWBERG ON CLASS ACTIONS § 11.51, at 158 (courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered").

The proposed Settlements here were the product of lengthy, arms'-length negotiations, undertaken by experienced counsel in good faith after substantial factual investigation and legal analysis. As highlighted above and as also described in the accompanying papers, at the time the Settlements were reached in the Invesco sub-track, Plaintiffs and Plaintiffs' Counsel were well informed of the strengths and weaknesses of Plaintiffs' claims, both factually and legally, and were able to use this knowledge to engage in a complex negotiation process with multiple defendants.

The settlement negotiations with defendants were hard fought and often very complicated, given the number of parties involved, and involved many contested issues, including liability and damages. The fact that several years intervened between the first

agreement in principle with the Canary Defendants and the last agreement to settle, demonstrates, in part, that Plaintiffs and their counsel were not willing to settle easily but were determined to pursue this litigation until they and their counsel were able to negotiate proposed settlements that they considered fair and adequate. For example, as detailed in the BLB&G Declaration, prior to reaching a settlement with the Invesco/AIM fund family defendants, plaintiffs engaged in lengthy, hard-fought settlement negotiations with this group of defendants, which culminated in mediation sessions before a retired judge for which the parties prepared and exchanged detailed statements laying out the strengths of their cases, with a focus on the issue of damages. *See* BLB&G Decl. ¶ 24; Rifkin Decl. ¶ 15. The fact that the Settlement reached with Invesco/AIM Defendants and the other proposed Settlements are the product of lengthy, arms'-length negotiations, undertaken by experienced counsel in good faith after substantial factual investigation and legal analysis, weighs strongly in favor of their approval. *See Mills*, 265 F.R.D. at 255 (where settlement was the "product of a long series of dealings" between class counsel and defendants and the negotiations were "sufficiently thorough [and] contentious," this factor weighed in favor of settlement); *MicroStrategy*, 148 F. Supp. 2d at 665 (the settlement was fair where counsel "participated in numerous meetings and extensive and intensive discussions extending over a period of months"); *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991) (approving settlement where negotiations were found to be "hard fought and always adversarial" and there was "no indication of any collusion").

### 3. The Experience of Counsel in Securities Class Action & Derivative Litigation

As set out in firm resumes submitted to the Court, Lead Counsel for all Plaintiffs have extensive experience in litigating their respective types of Actions (*i.e.*, securities class actions, ERISA class actions and derivative actions), and have successfully litigated these types of cases

in courts throughout the United States.  *See* BLB&G Decl. Ex. 4-C; Affidavit of Samuel K.

Rosen in Support of Joint Petition for Attorneys' Fees and Reimbursement of Expenses Filed on

Behalf of Harwood Feffer LLP ("ERISA Decl."), Ex. 3; Rifkin Decl. Exs. 3-10.

After informing themselves of the salient factual and legal circumstances in their

respective Actions and weighing the potential risks and costs of continued litigation, Plaintiffs'

Counsel have concluded that the Settlements are fair, reasonable, and adequate and in the best

interests of each of the parties they represent.  The judgment of experienced counsel that the

proposed settlements are fair and adequate should be given considerable weight by the Court.

*See Flinn*, 528 F.2d at 1173.  "[W]hen Class Counsel are 'nationally recognized members of the

securities litigation bar,' it is entirely warranted for this Court to pay heed to their judgment in

approving negotiating, and entering into a putative settlement."  *Mills*, 265 F.R.D. at 255

(quoting *MicroStrategy*, 148 F. Supp. 2d at 665).

The fairness of the Settlements is further supported by the fact that Investor Class Lead

Plaintiff, the City of Chicago Deferred Compensation Plan, an institutional investor with a

substantial financial interest in the outcome of this action, participated in the settlement

negotiations and approved of the Settlements.  *See* Declaration of Karen Dorff, Senior Counsel in

the City of Chicago Department of Law, which represents the City of Chicago Deferred

Compensation Plan, attached to the BLB&G Decl. as Ex. 1.   *See In re EVCI Career Colls.

Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27,

2007) ("a settlement reached under the supervision of appropriately selected lead plaintiffs is

entitled to an even greater presumption of reasonableness"); *In re Global Crossing Sec. & ERISA

Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (the participation of a sophisticated institutional

investor lead plaintiff in the settlement process supports approval of the settlement).

### C. Application of the Adequacy Factors Supports Final Approval of the Settlements

In assessing the adequacy of a proposed settlement, courts in the Fourth Circuit consider the following factors: (i) the relative strength of the plaintiffs' case on the merits; (ii) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (iii) the anticipated duration and expense of additional litigation; (iv) the solvency of defendants and the likelihood of the recovery on a litigated judgment; and (v) the class's and current shareholders' reaction to the proposed settlements. *See Jiffy Lube*, 927 F.2d at 159; *Zimmerman*, 800 F.2d at 391-92; *see generally* Omnibus Final Approval Memo § I.C. The proposed Settlements are adequate under these standards and should be approved by the Court. Indeed, in the opinion of Plaintiffs and their counsel, the Settlements represent very positive results for the Classes and Invesco/AIM Funds.

#### 1. The Strength of Plaintiffs' Cases and the Potential Difficulties of Proof or Strong Defenses

While Plaintiffs and Plaintiffs' Counsel believe their respective claims are strong on the merits and that their respective claims would ultimately result in a verdict, litigation is never free from risk and uncertainty, and Plaintiffs and Plaintiffs' Counsel recognize that Plaintiffs' success was not assured. *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed."); *see also S.C. Nat'l Bank*, 139 F.R.D. at 340 ("Although the plaintiffs . . . may firmly believe that their claims have merit, the complexities and uncertainties characteristic of class action securities litigation, . . . make it appropriate for such plaintiffs to compromise their claims pursuant to a reasonable settlement."). As in every complex case of this kind, Plaintiffs faced formidable obstacles to recovery, both with respect to liability and damages. The Actions

before the Court were especially complex, involving complicated legal and factual issues as well as multiple defendants.

In particular, courts have frequently recognized that securities fraud claims present numerous hurdles that plaintiffs must overcome to establish the elements of liability, including *scienter*, at trial and to prove damages. *See, e.g.*, *Mills*, 265 F.R.D. at 256 (plaintiffs cannot never be confident of the outcome of securities fraud cases because "[e]lements such as scienter, materiality of misrepresentation and reliance by the class members often present significant barriers to recovery"); *MicroStrategy*, 148 F. Supp. 2d at 664 ("the complexities and uncertainties characteristic of class action securities litigation, and the associated expenses of such litigation, make it appropriate for . . . plaintiffs to compromise their claims pursuant to a reasonable settlement"); *S.C. Nat'l Bank*, 139 F.R.D. at 340. Similarly, derivative litigation is "notoriously difficult and unpredictable." *Granada Invs., Inc. v. DOG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983).

Moreover, the mutual fund investment litigation generally, and the Actions in this sub-track specifically, posed additional, unique challenges to establishing liability and proving damages that would have created additional hurdles for the recovery by the Plaintiffs above and beyond the risks present in class action and derivative litigation.

***Risks of Establishing Liability***. First, there would have been risks involved in establishing that the defendants' alleged participation in or facilitation of market timing and late trading violated the law relevant to the claims in each respective Action because there is little or no established precedent for applying Plaintiffs' legal theories of liability to the specific factual context of their claims. Especially at the time the Settlements were reached, this lack of precedent as to how or whether these claims would fit into the existing legal framework of the

relevant laws created substantial unpredictability as to the ultimate outcome of the case following motions for summary judgment, trial and potential appeals. If the Investor Class and Derivative Actions had continued to be litigated, it is highly foreseeable that defendants would have raised many of the same – and perhaps additional – arguments raised by other defendants in the MDL in the cases that were litigated through summary judgment. Those defenses – which in some instances proved successful in the MDL actions litigated through summary judgment – may have included: lack of standing, no actionable statement/omission, no duty to disclose, lack of scienter, no reliance or presumption of reliance, and/or failure to establish "scheme" liability. *See, e.g.,* BLB&G Decl. ¶ 37.

In addition, there was significant doubt concerning whether, and to what extent, defendants' conduct violated §36(b) of the Investment Company Act, which was the principal derivative claim raised in these actions. The standards for establishing a violation of that statutory provision have been unsettled, including most notably the issue of whether, and to what extent, alleged misrepresentations and failures to disclose the conduct alleged here to the Invesco fund directors would constitute a violation of §36(b) and, if so, the measure of recoverable damages.

***Risks of Establishing Damages***. In addition to the substantial risks of establishing liability against defendants, these Actions also presented additional, equally significant risks in connection with proof of damages. There would have been substantial dispute as to whether, and to what extent, the alleged market-timing and late-trading activity of the defendants damaged the members of the Classes who owned shares in the mutual funds when these practices occurred or damaged the Invesco/AIM Funds. Certain potential outcomes with respect to liability issues could have dramatically limited the available damages, if for example, *scienter* was found

lacking in those market-timing transactions that were not shown to be specifically agreed to by the Invesco/AIM Advisor Defendants. *See, e.g.*, *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 752-53 & n.12 (D. Md. 2008); *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d 530, 536-37 (D. Md. 2009). Similarly, the damages recoverable under Section 3(b) would have been a significant issue.

Defendants also would have argued that, to the extent that members of the Classes or the Invesco/AIM Funds had suffered damages at all, the payments made by certain of the defendants to the SEC and other government regulators and subsequently distributed to investors in certain of the Invesco/AIM Funds (and to the Invesco/AIM Funds) should offset any damages recovered at trial. This argument was particularly formidable in light of this Court's summary judgment decisions in other sub-tracks requiring such an offset. *See, e.g.*, *Mut. Funds Inv. Litig.*, 590 F. Supp. 2d at 751-52; *In re Mut. Funds Inv. Litig.*, 608 F. Supp. 2d 677 (D. Md. 2009).

Many of the defendants in the Invesco sub-track have paid significant amounts in disgorgement and civil penalties that were (or will be) distributed to investors in certain of the Invesco/AIM Funds (or to the Funds), which defendants may contend offset damages. For example, Invesco Funds Group, Inc. alone paid $325 million, including disgorgement of more than $215 million, into the SEC's fair fund – an amount which the Independent Distribution Consultant for that settlement concluded was sufficient to compensate for all damages covered by that settlement. *See, e.g.*, BLB&G Decl. ¶¶ 38-41 . Although Plaintiffs were well prepared to dispute that assessment, in light of the uncertainties about the amount of damages that could be established at trial, the very significant size of the restitution payments made by these key defendants that have or will be distributed to investors in the Invesco/AIM Funds and the Court's previous decisions on this matter, Plaintiffs faced a very real risk that – even if they were

successful in establishing liability – all or a substantial portion of the damages proven would have been offset by the distributions from these regulatory settlements.

In addition, as the Court is aware, there are a variety of competing views about the proper way to measure the damages suffered by investors as a result of alleged market timing, which could result in substantial differences in the overall calculation of damages.  This issue would certainly have been the subject of competing expert testimony at summary judgment and trial.  As with any issue subject to contested expert testimony, this created additional litigation risk because Plaintiffs could not be certain that their experts' view of the matter would be accepted by the Court and the jury.  *See, e.g.*, *Mills*, 265 F.R.D. at 256 ("the damages issue would have become a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury") (quoting *MicroStrategy*, 148 F. Supp. 2d at 666-67).

***Risks of Establishing Class Certification***.  Finally, if litigation had continued, defendants would also have vigorously contested class certification (as occurred in other MDL actions where the litigation continued to that point).  Although Investor Class Lead Plaintiff and ERISA Lead Plaintiff believe that their Actions are appropriate for class treatment, this was an additional risk that could not be entirely discounted.  *See In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) (risk that the court might deny motion for class certification, supported approval of the settlement); *Global Crossing*, 225 F.R.D. at 460 (same).  In particular, although this is not concern with respect to classes certified for settlement purposes, a class certified for trial consisting of investors in 14 separate mutual funds might have raised manageability concerns under Rule 23(b)(3).  *See Mut. Funds Inv. Litig.*, 590 F. Supp. 2d at 759 (deferring ruling on class certification motions in Janus and Putnam sub-tracks but noting, ominously, that "considerations of litigation manageability must be taken into

account in defining the scope of any class certification"). Indeed, certain MDL defendants previewed these arguments in their 2007 motion to dismiss for lack of standing or, in the alternative, determination of the applicable law under Rule 23. *See* BLB&G Decl. ¶ 35. Given the comparatively small size of individual shareholders' claims, failure to obtain class certification here would have effectively ended any hope of a recovery against any remaining defendant.

* * *

In conclusion, the amount of any proposed settlement cannot be considered in the abstract but must be measured against the strengths and weaknesses of the plaintiffs' case. *See Flinn*, 528 F.2d at 1172. Here, the risks to recovery posed by difficulties in establishing liability, proving damages above the amount of any offset(s) and obtaining class certification were substantial and there was no guarantee that Plaintiffs would succeed. The proposed Settlements eliminate these risks and create immediate and substantial recoveries for the benefit of the Classes and the Invesco/AIM Funds. Indeed, in the judgment of Plaintiffs and Plaintiffs' Counsel, the Settlements represent excellent results for the Classes and the Invesco/AIM Funds under the circumstances.

### 2. The Anticipated Duration and Expense of Additional Litigation

Another reason for the parties and their counsel to recommend, and the court to approve, a proposed settlement is the expense and duration of further litigation. *See generally* Omnibus Final Approval Memo § I.C.2; *see also, e.g.*, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 434 (1968) (court must consider "the complexity, expense, and likely duration of such litigation"); *Mills*, 265 F.R.D. at 256 ("the substantial time and expense" of continued litigation strongly supported settlement in a securities class action);

*MicroStrategy*, 148 F. Supp. 2d at 667 (approving settlement where "there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.").

At the time the Settlements were reached, formal discovery had not reached an advanced stage with respect to certain of the Settling Defendants, including, for example, the Canary and BAS Defendants, and if the Actions were to proceed, there is no question that discovery (both fact and expert) would be expensive and lengthy. In addition, motions for class certification and summary judgment, a trial and the inevitable post-trial appeals would entail substantial time and significant expense for both sides. Given the already substantial amount of time devoted to the Actions over the course of the past six years, continued litigation would mean that recovery for the Classes and/or the Invesco/AIM Funds could be delayed for many additional years.[5] Accordingly, this factor also weighs heavily in favor of the Settlements.

### 3. The Solvency of Defendants and the Likelihood of Recovery on a Litigated Judgment

The reasonableness of a proposed settlement should be considered in light of the solvency of the defendants and the likelihood of recovery on a litigated judgment. *See Jiffy Lube*, 927 F.2d at 159; *Serzone*, 231 F.R.D. at 245; *MicroStrategy*, 148 F. Supp. 2d at 667; *S.C. Nat'l Bank*, 139 F.R.D. at 341; *see generally* Omnibus Final Approval Memo § I.C.3.

Although many of the defendants in this sub-track may have been theoretically capable of paying a larger judgment than the amount recovered through settlement, courts have repeatedly noted that, where other factors weigh in favor settlement, this fact will not stand in the way of

[5] Such delays would, of course, have further exacerbated the difficulties already faced by some Investor Class Members in obtaining information or documents concerning their holdings in the Invesco/AIM Funds.

approval of a proposed settlement. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (affirming district court's conclusion that a defendant's "ability to pay a higher amount was irrelevant to determining the fairness of the settlement"); *Serzone*, 231 F.R.D. at 245 ("Since the remaining factors weigh in favor of finding the Settlement to be adequate, this factor may be given little weight."); *Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002) ("The Court has no doubt [defendant] would be able to satisfy any judgment entered against it. That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution.").

**4. Investor Reaction to the Proposed Settlements**

The reaction of class members and current fund investors to the proposed settlements "as expressed directly or by failure to object" is also "a proper consideration for the trial court." *Flinn*, 528 F.2d at 1173. A low number of objections or opt-outs in comparison to the size of the settlement class can provide evidence of the fairness of the proposed settlement. *See* Omnibus Final Approval Memo at § I.C.4. However, that "a settlement is not unfair or unreasonable simply because a large number of class members oppose it." *Flinn*, 528 F.2d at 1173. Here, the reaction of the Classes and the relevant current Invesco/AIM Funds shareholders to the Settlements has been, on balance, overwhelmingly positive and there have been relatively few requests for exclusion. Therefore, this factor also weighs heavily in favor of settlement approval, as described in greater detail below.

By way of background, the Classes and current shareholders of the Invesco/AIM Funds received notice of the settlement pursuant to the Preliminary Approval Order. In accordance with that order, the Garden City Group, Inc. ("GCG"), the Court-appointed Claims Administrator for the Invesco sub-track, implemented the extensive notice program (the "Notice Program") developed by counsel and approved by the Court to advise potential members of the Investor

Class and current shareholders of the Invesco/AIM Funds of the pendency of the Actions, the proposed Settlements and their rights with respect thereto. Thus, GCG, under the supervision of Investor Class Lead Counsel: (i) caused the Court-approved Notice of Pendency and Proposed Settlements of Class Actions, Motion for Attorneys' Fees and Expenses, and Settlement Hearing (the "Notice")[6] to be mailed to all identifiable members of the Classes, which resulted in approximately 2.15 million Notices being received by Class Members as of September 10, 2010;[7] (ii) published the Court-approved "global" summary notice (the "Publication Notice") – which was directed at members of the Classes and the current Invesco/AIM Funds shareholders – once in each of *People* magazine, *The Wall Street Journal*, and *The New York Times*, and over *PR Newswire* and arranged for notice of the settlements through various web-based media outlets targeted at potential mutual fund owners;[8] (iii) established a specific website concerning the Settlements that provides for, among other information, downloadable copies of the Notice, Long-Form Notice, and Proof of Claim and which has received a total of over 150,000 visits through September 10, 2010, *see* Invesco Notice Decl. ¶ 13; (iv) established a toll-free telephone hotline that has received over 15,000 calls as of September 10, 2010, *see* Invesco Notice Decl. ¶ 15; and (v) maintained an email address and received and responded to several thousand emails

[6] Consistent with the requirements of Rule 23(c)(2)(B) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(7), the Notice contains, *inter alia*, a description of the nature of the Actions, the definition of the Classes certified; and the material terms of the Settlements, including an estimate of the per share recovery for Investor Class Members; a description of the claims that will be released in the Settlements; a description of Class Members' right to request exclusion from the Classes and the procedure for doing so; and a description of the right of Class Members and current shareholders of the Invesco/AIM Funds to object to the proposed Settlements, Plan of Allocation or counsel's request for attorneys' fees and expenses and the procedure for doing so.

[7] *See* Declaration of Stephen J. Cirami Concerning Notification to Class Members and Report on Exclusion Requests Received in the Invesco Sub-Track (the "Invesco Notice Declaration" or "Invesco Notice Decl."), attached the BLB&G Decl. as Exhibit 2.

[8] *See* Declaration of Stephen J. Cirami Concerning Compliance with the Publication Components of the Notice Program (the "Publication Declaration" or "Publication Decl."), attached hereto as Exhibit 3.

related to the Invesco sub-track, *see* Invesco Notice Decl. ¶ 16. In response to the inquiries it has received in connection with the Notice Program, with the supervision of counsel, GCG has taken steps to ensure that it promptly responds to all written and telephone correspondence that it has received. BLB&G has undertaken substantial efforts to consult and coordinate regularly with GCG, and has dedicated a team of professionals at its firm to respond promptly to any and all inquires that it receives from shareholders. *See* BLB&G Decl. ¶45.

To date, the reaction of the Classes and current fund investors has been overwhelmingly positive, with very few exceptions. Indeed, a total of only 16 objections and 41 requests for exclusion have been received,[9] in comparison to the more than 2.1 million Notices that have been mailed to Class Members and the over 37,000 claims that have already been filed as of September 10, 2010. *See* Invesco Notice Decl. at ¶ 18. The due date for filing claims is not until December 8, 2010, and Plaintiffs anticipate that additional claims will be filed. Moreover, it has been BLB&G's experience – from its direct contact with various Class Members, and in particular those class members who have contacted us with questions about the Settlements and/or the claims process – that Class Members are pleased with the Settlements and with BLB&G's work in helping to bring the Settlements about. *See* BLB&G Decl. ¶ 54.

The small number of objections in comparison to the size of the settlement class supports the fairness of the Settlements. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) (where 18 class members filed written objections and 72 requested exclusion from a class of only 27,800 members, the district court "properly concluded that this small number of objections weighed in favor of the settlement"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 318 (3d Cir. 1998) (300 objections by class members and 19,000 opt-outs were "truly insignificant" in comparison to the 8 million policyholders provided

[9] A chart identifying all objections received to date is attached as Exhibit 5 to the BLB&G Declaration.

with class notice and thus, "the limited number of objections filed . . . weighed in favor of approving the settlement"); *Int'l Union v. Ford Motor Co.*, Nos. 05-74730, 2006 WL 1984363, at *27 (E.D. Mich. July 13, 2006) (where "800 out of more than 170,000 class members," less than 0.5% of the class, objected, the court found that this "very small level of opposition [was] another reason to conclude that the Settlement is fair, reasonable, and adequate").

Moreover, to date, none of the objections or requests for exclusion have been filed by any large institutional investors, a circumstance that courts have often found to support the conclusion that a proposed settlement is fair and reasonable. *See, e.g.*, *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 166 (3d Cir. 2006) ("No objections were filed by institutional investors, those with the greatest financial stake in the settlement."); *OCA*, 2009 WL 512081, at *16 ("Lead Counsel also noted that a number of the claimants were sophisticated financial institutions such as state and municipal pension funds. . . . That those institutions filed claims and voiced no objections further attests to the general support for the settlement.").

In addition, especially when evaluated in context, Plaintiffs respectfully submit that the objections submitted to date lack merit. For example, two of the objections generally oppose the size of the Settlements as too small.[10]  As detailed herein, in light of the complexity of these cases and the significant risks that would be faced if plaintiffs were to proceed with continued litigation and a possible trial, a recovery in excess of $20 million represents an excellent result in this matter. Ten objections have been received to the requirement that Investor Class Members submit certain basic information or documents showing the number of shares that they owned in

---

[10] *See* BLB&G Decl. Exh. 5.  Five of the objections received concern counsel's request for attorneys' fees and expenses.  As described in the accompanying Memorandum submitted in support of Plaintiffs' Counsel's application for an award of attorneys' fees and expenses, given the substantial obstacles that they faced in achieving a recovery and the substantial amount of time and resources that they dedicated to this litigation, the requested total fee award of 15% of the Gross Settlement Fund applied for collectively by the undersigned counsel represents appropriate compensation for Plaintiffs' Counsel.

the Invesco/AIM Funds in order to file a claim for payment from the settlement proceeds.  In order to administer the proposed Plan of Allocation (described below) and accomplish a distribution of the Net Settlement Fund that bears a reasonable relation to the strength of Investor Class Members' relative claims, here it was necessary to obtain information about Investor Class Members' ownership of the Invesco/AIM Funds during the time period, including which funds and how many shares they owned.  Moreover, unlike in a typical securities class action settlement administration, where class members are required to submit detailed documentation – such as brokerage confirmations – proving each purchase and sale transaction during the class period, Plaintiffs and their counsel have taken numerous steps here to reduce the burden on Investor Class Members and limit the information and documents they are required to submit. First, only basic year-end information is requested, instead of the detailed transaction information typically required in other securities fraud class actions.  Additionally, with respect to the Investor Class Members for whom Invesco possesses shareholding information – generally those investors who purchased or held shares directly with Invesco – a streamlined process has been developed and is in place allowing class members to call representatives of Invesco at a designated toll-free number and receive a information concerning their Invesco/AIM Funds holdings, free of charge, that will allow them easily to complete the claim form and will be considered sufficient documentation to support the claim.  This process for obtaining historical holding information has been, and will continue to be, publicized on the Invesco settlement website, the toll-free telephone Settlements hotline and in the many direct written and telephonic communications that the Claims Administrator and Investor Class Lead Counsel have with class members who make inquiries or who submit deficient claims.

Finally, with respect to all Investor Class Members, the documentation requirement is

flexible by design – the claim form does not require any specific type of documentation of the shares held – and class members are encouraged to submit the best documentation they reasonably have or can obtain, such as tax filings, a signed letter from an accountant or broker, or any other verified information. The goal of this relaxed documentation requirement was to permit as many class members to participate as possible, while still protecting the substantial interest of the class in avoiding payment of fraudulent claims. Courts have repeatedly upheld as proper, and indeed necessary, claims filing processes in securities case that have required much more detailed transaction information. *See, e.g. Marsh & McLennan*, 2009 WL 5178546, at *25 (rejecting objection to requirement that class members list purchases, sales and holdings of stock on their claim form, noting that "[w]ithout that necessary information the Claims Administrator could not calculate claimants' distributions" and that this requirement "comport[ed] with the long-approved procedures for efficient management of class-action settlement distributions."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV 3288 (DLC), 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) ("The information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds.").[11]

As is customary, once the September 21, 2010 deadline for submitting objections has passed – and any additional objections are received and evaluated – Plaintiffs may provide responses to the objections received to date and to any later-filed objections in their October 6, 2010 filing, as necessary and appropriate.

---

[11] In this claims administration, in addition to the traditional claim filing method, whereby Investor Class Members may mail a paper copy of their claim form to the Claims Administrator, Investor Class Members have the option to submit their claims online using a simple, step-by-step process via the Invesco settlement website. Of the over 37,000 claims filed through September 10, 2010, over 27,000 have been submitted via the settlement website's on-line claims filing mechanism. *See* Invesco Notice Decl. at ¶ 18.

## III. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

Approval of a plan of allocation is governed by the same standards by which class and derivative action settlements are scrutinized – namely, it must be fair, reasonable and adequate. *See Mills*, 265 F.R.D. at 258; *MicroStrategy*, 148 F. Supp. 2d at 668; *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005); *see generally* Omnibus Final Approval Memo § III. Where experienced, qualified counsel have endorsed the allocation plan, "the allocation need only have a reasonable and rational basis," *Mills*, 265 F.R.D. at 258, and the opinion of class counsel is "entitled to significant respect." *Id.*; *see also EVCI*, 2007 WL 2230177, at * 11 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

Although the allocation need not be done with "scientific precision," a plan of allocation should seek to distribute settlement proceeds based on the relative strengths and weaknesses of class members' claims. *Mills*, 265 F.R.D. at 258-59; *see MicroStrategy*, 148 F. Supp. 2d at 669 (plan of allocation properly made "interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue"); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.) (where "real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh "distribution of the settlement" . . . in favor of the plaintiffs whose claims [are] more likely to succeed"), *aff'd*, 117 F.3d 721 (2d Cir. 1997). The Court also has substantial flexibility in approving methods for the submission and processing of claims under the Plan of Allocation. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.66, at 331 (2004); Omnibus Final Approval Memo § III.

The proposed Plan of Allocation, as set forth in the Long-Form Notice at pages 8 to 11, provides for a fair and equitable way to distribute the net proceeds of the Settlements (and the

funds obtained by the Office of the New York Attorney General in its settlement with the Canary Defendants) to members of the Classes and the Invesco/AIM Funds. The Plan of Allocation provides that eligible Investor Class Members who submit valid claim forms will receive *pro rata* allocations from the Net Settlement Fund based on the amount of their Recognized Claims.[12] Their Recognized Claims will be based on the number of shares owned in each of the Invesco/AIM Funds at or around the end of each year from 1999 to 2003 and a formula that reflects Plaintiffs' damages expert's estimate of the amount of dilution losses per share caused by the alleged late-trading and market timing in each specific Invesco/AIM Fund during each time interval. *See* BLB&G Decl. ¶¶ 56-60. After distribution of the entire Net Settlement Fund to Investor Class Members and additional re-distributions to Investor Class Members, to the extent that they are deemed cost-effective by Plaintiffs' Counsel, any balance remaining in the Net Settlement Fund – for example, as a result of uncashed or undeliverable checks or for other reasons – will then be distributed to the Invesco/AIM Funds subject to Court approval. *See* Long-Form Notice ¶ 14.Q, at p. 10.

The reaction to the Plan of Allocation to date have been overwhelmingly positive – as of the filing of this Declaration, only one objection that could be understood as concerning the Plan of Allocation has been received. Thus, as explained herein, the Plan of Allocation was designed to be – and is – fair, reasonable and adequate under the circumstances of these Actions and should be approved.

[12] The Amvescap Plan may submit a claim form to receive a payment on behalf of itself and its participants and distribute the proceeds to ERISA Class Members.

## IV. THE PROPOSED CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES UNDER RULE 23

In granting final settlement approval, the Court should also certify the proposed Investor Classes and ERISA Class for purposes of settlement under Rule 23 of the Federal Rules of Civil Procedure. Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *Mills*, 265 F.R.D. at 266 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995)); *S.C. Nat'l Bank*, 749 F. Supp. at 1428 ("settlement classes have proved to be quite useful in resolving major class action disputes") (citations omitted).

The proposed Investor Class is defined as every natural person or any legal entity who, during the period between and including July 30, 1999 and November 24, 2003, purchased, owned or held shares in any of the Invesco/AIM Funds, subject to the exclusions set forth in ¶ 4 of the Preliminary Approval Order. The proposed ERISA Class is defined as all Persons who were participants in or beneficiaries of the Amvescap Plan during the Class Period and whose accounts included any investments in the Invesco/AIM Funds, subject to the exclusions set forth in ¶ 7 of the Preliminary Approval Order.

Both of these proposed Classes meet the standards of class certification under Rule 23. These standards, which apply equally in the context of preliminary and final approval, are set out in greater detail in Plaintiffs' Omnibus Memorandum of Law in Support of Preliminary Approval of Proposed Settlements (Dkt. No. 1012) ("Omnibus Prelim. Approval Memo") at 7-14, and Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Settlements in the Invesco sub-track (Dkt. No. 1011-1) at 13-21. Nothing has changed since then that would

affect this analysis and there have been no objections to certification of the Classes for settlement purposes.

## V. THE NOTICE TO CLASS MEMBERS AND CURRENT SHAREHOLDERS SATISFIED THE REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE, THE PSLRA, AND DUE PROCESS.

As discussed above, Investor Class Lead Counsel and the Claims Administrator have successfully executed the Notice Program for providing notice to Class Members and current shareholders of the Invesco/AIM Funds as approved by the Court in the Preliminary Approval Order. Through September 10, 2010, over 2.1 million Notices have been received by Class Members. *See* Invesco Notice Decl. ¶ 12. These mailings were supplemented by the global publication notice program, which included publication of a summary notice pertaining to sixteen of the seventeen sub-tracks, including the Invesco sub-track, in a number of nationally circulated magazines and newspapers and through various web-based media outlets, which were all specifically targeted to reach likely mutual fund owners. *See* Publication Decl. ¶ 4. The Settlements were further publicized on the Invesco mutual funds settlement website, which included copies of the Notice, Long-Form Notice, Claim Form and other information and has received over 153,000 visits since it went live on June 30, 2010. *See* Invesco Notice Decl. ¶ 13.

This combination of individual mailed notice and robust publication notice, which was executed in accordance with the Court's Preliminary Approval Order, was reasonably calculated to inform potential class members and current fund investors about the Settlements and constituted the best notice practicable under the circumstances, particularly with respect to a class of this size and geographic distribution. *See* Omnibus Final Approval Memo § IV. As previously found by the Court in its Preliminary Approval Order, the notices fairly apprised potential class members of the Settlements and their individual rights and options open to them with respect to the Settlements and provided all the specific information required by Rule

23(c)(2), Rule 23(e) and the PSLRA. *See* Omnibus Prelim. Approval Memo at 5-6. The notice provided to current shareholders of the Settlements of derivative action satisfied the reasonableness standards of Rule 23.1.

## VI. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court (i) grant final approval to the Settlements as fair, reasonable and adequate; (ii) approve the proposed Plan of Allocation; (iii) certify the proposed Investor and ERISA Classes for purposes of settlement; and (iii) approve the notice of the Settlements given to the class members and the current shareholders of the Invesco/AIM Funds.

DATED: September 14, 2010

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ *Chad Johnson*
Chad Johnson
William C. Fredericks
Jerald Bien-Willner
John J. Mills
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400

***Lead Counsel for the Investor Class Lead Plaintiff and the Investor Class***

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Demet Basar
270 Madison Ave.
New York, NY 10016
Telephone: (212) 545-4600

***Derivative Lead Counsel***

**HARWOOD FEFFER LLP**

Robert I. Harwood
Samuel K. Rosen
Matthew M. Houston
Peter W. Overs, Jr.
488 Madison Avenue
8th Floor
New York, NY  10019
Telephone:  (212) 935-7400

***ERISA Class Lead Counsel***

BLBG #478351.4